This matter is the United States versus Ali Amirnazmi. Ms. Ainslie. Yes, Your Honor. Good morning, and may it please the Court. I am Elizabeth Ainslie. I was trial counsel below. I would like to ask for three minutes of rebuttal time, if I may. You may have it. Of course, you can argue anything that you would like, but we are most interested in the delegation issue and the difference between the criminal and civil context. Excellent. I have actually an agenda of my own, if I may offer that to the Court. You may do that. There are three miscellaneous but important points that I want to start with. Then I thought I would like to talk some about the informational exemption and use that as a segue into the non-delegation issue. So I intend, unless the panel has questions about the variance or the abuse of Rule 17 of the subpoena power, I won't touch on them, but I'd be happy to. No, the case was very well briefed on both sides. I think we understand those issues. Thank you, Your Honor. I thought at least the ambiguities, if there were any, were in the informational exemption and in the delegation issue. The three important points that I wanted to raise first, one of them is, in a sense, a candor with the tribunal points. I discovered, or one of my colleagues discovered, that 1701, the principal IEPA provision, has a note attached to it that is a public law. So it is something that Congress passed. I wanted everybody to know that. We were not trying to conceal it. Ms. McKeon and I have corresponded about it, so she is aware of it as well. Thank you. She pointed out, actually, that it has most recently been amended, that public law, that Note 1 to Section 1701, this past summer, and it was Public Law 111-195, which fairly comprehensively revamped the Iran Sanctions Act. It does nothing, to my knowledge, that actually alters the analysis in this case, but I would like to draw the panel's attention to it because, in my judgment, it outlines the kinds of intelligible principles that should have been enacted when 1701 existed and Dr. Amir Nazmi was indicted under IEPA. It outlines many different, it has a huge definitional section, which would have gone far to eliminate the ambiguities and the vagaries that I see in this statute and in the regulations. It is the way it should have been done. It says nothing about, that would, however, provide intelligible principles in this particular area, relating, as it does, to criminal liability, or alleged criminal liability for, basically, foreign commerce. The second point that I want to make is that I am not asking that the panel find unconstitutional the Iran embargo overall. Not only do I find that, in my judgment, the Congress has done it right now in those areas where it has legislated with respect to the Iran embargo in this most recent public law, but I think that in many areas it is, indeed, in the President's particular expertise in foreign affairs, just not in this particular, in Dr. Amir Nazmi's case. So my point is that it's unconstitutional as applied outside of the area that Congress has legislated intelligible principles for. And in general, and in particular, in the area of criminal law, because it seems to me, as you have pointed out, that is the nub of this case, that Dr. Amir Nazmi has been, spent the last two and a half years in prison because of a conviction for an extraordinarily vague, and, well, violation and law. But there are counts of conviction that are not at issue on appeal. That's correct. But I think that those were, frankly, in my judgment, ancillary. I think that if the case were to be remanded to Judge Roof for resentencing on those counts, you would not see a sentence anything like the four years. Well, he had a 48-month sentence. That was a downward variance. Yes, it certainly was. We have not appealed the sentence. No, no, I understand that. No, no, all I meant was, there are other counts of conviction, I agree. So it was a point of hyperbole, totally, that I said he had spent 48 months just for violating the IEPA. He had other counts of criminal violations that we have not appealed. But I think the, and the third point that I would like to make before I actually launch into the argument, is that there is ambiguity, I realize, in retrospect in our briefs as to whether we are asking that all of the IEPA counts be stricken. And we are. It's not just two and five. It is count one, which is the conspiracy count, that obviously encompasses the substantive offenses, as well as the previous dealings that Dr. Amor-Nazmi had with the National Petrochemical Company. So the count one, the conspiracy count, I am also attacking on informational exemption grounds. And count four, which is a substantive count, but, and does not relate to CAMPLAN, the software and database product that was primarily at issue in this case. But count four relates to a couple of nondisclosure agreements, confidentiality agreements, that Dr. Amor-Nazmi entered into with a company in Iran, relating to prospective projects. So in my judgment, those confidentiality agreements, which are found at 434 and 510 of the appendix, those are informational, entitled to the protection of the informational exemption, as well as the CAMPLAN ones. But clearly, insofar as the government's theory is concerned, the government's theory under the, what I'll call the carve-out, the regulation that says that if materials are not fully created and in existence at the time of the transaction, whatever that means, that theory applies only to the CAMPLAN software and database counts. So having cleared away the underbrush, let me say that I think that the informational exemption, Congress clearly intended that exemption to apply to this kind of case. That the government's efforts to turn a CD-ROM that contains information about chemical prices and data into a violation of this statute, simply because it comes, it's accompanied by a bit of software that allows the purchaser, wherever the purchaser may be in the world, whether it's DuPont or Dow Chemical or National Petrochemical Company of Iran, to add their own data or change their data, the data in the database, and then rerun the program, so to speak, so as to answer questions that the purchaser has about the usefulness of the data in the database, that that is totally unavailing. The government actually has not taken the position, as I hear it, as I read their brief, that the informational exemption does not apply. The government's position, as I read it, is that the informational exemption does apply, but that the carve-out then takes back from the exemption some area of criminal liability. And what did Judge Roof find? Judge Roof found that the information that the, she, as I recall, she based her decision on the fact that the government, in her view, had proven that the carve-out did apply, that this was, the fact that this database could be manipulated by means of the software meant that it was not fully created and in existence at the time of the transaction. I might point out that one of the, that is another of the reasons why we made the argument about the ambiguity of the regulation and the law, because I have no clue what any of this means. Not fully created and in existence at the time of the transaction. One of the questions I have is, what is the time of the transaction? What is the transaction, and what is the time of the transaction? At the time of the transaction involving the software, the software was simply a software package. It was clearly in existence and fully created. The fact that it could later be manipulated by the purchaser so as to change it does not mean that it was not at the time of the transaction. And remember... What do you consider to be the time of the transaction? This program or software was customizable by customer,  It was. So is it a transaction when the agreement is reached or when the disk is provided? I don't know. And I think that's the problem with this case. Didn't this go to the jury for decision? Of course it did. Every criminal case does. And they decided against you as a factual matter. They did. Well, obviously, every time I appear for the appellant, it's now more as a matter of law. But it's been decided really by the jury as a matter of fact. I don't think it has, because there was no dispute of fact with respect to the nature of this product. I think that it is, as we said in our brief, a matter of law that the informational exemption does apply. And I think that it's not a question of fact, but it is a question of law. Our argument, which the government, I think, has not responded to, that this carve-out, this regulation that says not fully created in an existence at the time of the transaction, that it is illegal itself because unauthorized by Congress. It criminalizes conduct that by the sweeping nature of the informational exemption, Congress indicated it did not want to criminalize. I thought there was one substantive IEAP account that the informational exemption did not apply to. No, Your Honor. That's the one, it does apply to it, I believe. The transaction that involved entering into a joint venture to develop an SAP plan. Correct, Your Honor. That's the account that I was referring to earlier. In my judgment, although that does not, that does not, the carve-out is not relevant to that account. The informational exemption itself does relate to it because in that case, the transaction amounted to a confidentiality agreement whereby information would be exchanged, whereby people in Iran would give information to Dr. Amir Nazmi and he would give information to them, pursuant to a nondisclosure agreement, with an eye toward seeing whether or not they wanted to enter into a transaction. Which brings me to the other point about the lack of standards in this statute. How is one to know if one wants to apply for a license, to get permission to do a transaction, if one is not permitted to talk to the other side to find out whether they're interested in the transaction, what the cost might be? Ms. Ainslie, we'll give you five more minutes. Linda, put on five minutes, please. Thank you. We do want to hear about the criminal... Your Honor, I think that the time has come, with all due respect for the courts, to bite the bullet on this and say that it is one thing to say that your export license will be revoked if you violate the Iran embargo. It is another thing altogether to say that you should go to jail. Congress itself has the legislative responsibility to create, in the first instance, criminal laws. If Congress does not do that, it is doubly, triply, quadruply important that if Congress is delegating that authority to the executive, that it put out intelligible principles, that it tell the... In the course of preparing for this argument, I looked up other statutes. The Clean Air Act, for instance, does indeed delegate to the president and the EPA administrator the ability to criminalize certain conduct. But in that statute, Congress has spelled out, in great detail, what is going to be negligent, what is going to be intentional, what is going to be a misdemeanor, what is going to be... What sorts of things the administrator should consider. Is there anything deficient here in terms of a scienter or willfulness requirement? Your Honor, if you have... Obviously, the scienter is important in any case, but as we have said, if it is not sufficient... You've also got a good faith defense. Your Honor, we certainly did. But in this particular case, it was... I don't mean you have. No, no. I mean there is a good faith defense. But I don't think that's an intelligible principle, Your Honor. In a way. I mean, obviously, in a way, it is. But when you have something as important as this, and when it is peculiarly within the responsibility of Congress, not only to provide legislation, and in most cases to provide criminal... To legislate in the area of criminal liability, but also when you have the constitutional responsibility for commerce with foreign nations, I think that in all of these cases, Congress has dropped the ball here. And although Dr. Amir Nazmi, as I said to the jury, was his own worst enemy, he looked as if he had scienter without any kind of rational basis. He was eager. What? He was eager. Well, he was irrational, Your Honor, I have to say. But in any event, it was... I don't think you can simply say, here is a law, however general, and if that scienter, a finding of scienter, remedies the total lack of intelligible principles, the total ambiguity, what is a transaction? When is a license required? When is something fully created or in existence at the time of the transaction, whatever that is? Scienter or irrationality, however you choose to put it, does not remedy defects in the law like that. I think it is a cop-out for... It would be a cop-out to simply say, well, what the heck, it's a defective... It's maybe an unconstitutional statute. It may be a totally vague regulation, but the man acted as if he had scienter, so... It's been found constitutional in the civil context by the Supreme Court, right? Which? AIPA? AIPA. It's been found constitutional in a criminal sense by the Second Circuit. Well, oh, that's... And the fourth. And the fourth. All right, that's... In D'Affir, that is a... I'm sorry, no, no, sorry. D'Affir, I have actually tried to do some research to see what D'Affir involved on the facts, and since it was a guilty plea and basically an appeal by agreement, it's very difficult to find. But it involved money laundering, it involved hundreds of thousands of dollars. My sense is that the Second Circuit was influenced by the fact that in that case it was a lot more within the foreign policy realm than this case is. This case, I cannot emphasize too much, does not involve a, you know, national security, it doesn't involve treaties, ambassadors, it simply involves commerce with foreign nations. And... I guess the point of my question was that I'm not aware of any authority that says you apply a different standard in looking at the unconstitutional delegation theory depending upon whether it's civil or criminal. If you are talking about authority as in Third Circuit precedent or Supreme Court precedent, no. But there... Over and over, judges... And there is a quote from Justice Brennan, which I don't have at my fingertips, but where Justice Brennan said, in a concurring opinion, if you are going to delegate, you need to have intelligible principles, particularly in the criminal arena. It is, you know, it's a merger of many different lines of principle, Your Honor, that you should not have to guess about your... We will have you back on rebuttal, Ms. Ainslie. Thank you very much. Good morning. Good morning. May it please the Court, I'm Bernadette McKeown, and I represent the United States in this matter. The defense asked this Court to take the extraordinary step of finding unconstitutional an act that has been in effect since 1977, and in a prior version since 1917, and which has been used by multiple presidents to declare national emergencies against foreign nations that pose a security threat to the United States. No court has found this statute unconstitutional, and this Court should decline this invitation, as IEPA does not constitute an unconstitutional delegation of Congress's legislative power to the president. The act delineates the policy, the general policy, and sets the boundaries of the presidential authority. In other words, it does contain intelligible principles that guide the exercise and constrain the exercise of the authority by the president. First, the act allows the president to prohibit and regulate commercial and financial transactions with foreign nations only when the president has found that those nations pose a threat to the national security, economy, or foreign policy of the United States. And that threat must be extraordinary and unusual. The president must make such a declaration with respect to each national emergency. The president is required to consult with Congress in every possible instance before exercising this authority, and then the president is required to periodically reaffirm the necessity for the declaration, and to report to Congress periodically. And in reporting to Congress, the president is required to include certain information. For example, the circumstances that necessitated the declaration of emergency. Why the president believed those circumstances constitute an unusual and extraordinary threat. The authorities to be exercised and the actions to be taken,  If Congress disagrees with a declaration, or even a particular sanction imposed, Congress has the authority by joint resolution to, through concurrent resolution, to terminate that declaration. There is a requirement that Congress shall meet. Yeah, the section 1622B of the national... To determine if the emergency procedure should be terminated. And that, your friend across the aisle, has complained vigorously, has not been done yet. Yes, Your Honor, section 1622B does state that upon the issuance of a declaration of emergency, Congress shall meet and consider a vote on whether to terminate a particular declaration. And I would submit to the Court that the fact that Congress did not formally meet and consider whether to vote certainly does not invalidate the delegation of authority and doesn't even invalidate any particular declaration. And there are multiple reasons for that. In the context, the statutory framework makes it clear. First of all, 1622B does not state it will terminate if Congress doesn't take this action. Yet, section 1703 recognizes that the president's failure to renew or reaffirm a declaration does automatically terminate that declaration. So there's a distinction there. Secondly, mere inaction by either house of Congress would effectively constitute a one-house veto, which itself is unconstitutional and has been found so by the Supreme Court in INS versus Chadha. So it certainly is... That does not lend itself to the conclusion that it would effectively terminate the resolution. Finally, 1622C also contains a whole procedure that Congress must go through in order to declare a joint resolution. And that would be meaningless if it would terminate just upon mere congressional inaction. There's also... So it's a prescription that has no remedy. I think in this context that Congress's inaction as Beacon Products case found, the First Circuit considered whether failure to take action automatically terminates a declaration. And they concluded that what it did was give Congress a mechanism to force those who may want to terminate a resolution, a mechanism to do so. But it did not require those who wanted to further or support a resolution to take action in order to force a resolution. Well, there's no suggestion by Ms. Ainslie that had they met, they would have terminated. Correct, Your Honor. So all the allegation really is is a technical... That's correct, Your Honor. Exactly. And I would point out that, although it does not appear in our brief, it is not Congress's practice to meet after any particular resolution and take a formal vote in this way. The fact that there's an automatic termination provision in 1622D also indicates... That's correct, Your Honor. I was getting to that. And finally, one other point is 1622E states that this is a function of Congress's rulemaking powers. And it's very unlikely that a private litigant would have the power to challenge Congress's exercises of its rulemaking functions. So in that regard, I don't think that that is controlling. To get back to the intelligible principles, a couple other points to make about that is that, as Judge Barry noted, the Act does also contain provisions for criminal sanctions. They have to be willful, and there's a good faith exception. And finally, the Act also sets forth the exemptions. For example, conduct that cannot be prohibited. The informational materials exemption. There are exemptions for expenses related to travel, for humanitarian aid, and so that they have, I believe... Is that where the Wrigley's chewing gum came under? The humanitarian food stuff? I believe so, Your Honor. Now, as Judge Van Aske noted, the Supreme Court has approved the delegation of authority under IEPA in the civil context. Now, do you want us to say that the standard is exactly the same in the criminal context, or are you willing to say that there's a somewhat higher standard in the criminal context, but that it is met here? I don't believe that this Court needs to resolve that issue, just as the Court in Toobie decided that it did not need to resolve and determine whether or not a higher standard apply. Because even if you look at the constraints that were imposed in the Toobie case, which involved criminal penalties, the constraints here are the equivalent, very comparable, as both the DeFeer Court and Arch Trading Court found. So I believe that the answer would be that even if a heightened standard would apply, as recognized in Toobie, the constraints here would meet that requirement. And again, it's the constraints contained in the statute. The idea that because Congress then did not follow up by enacting legislation that duplicated the authority conveyed in the Act, to me, just misses the point. There's no requirement that Congress then codify any resolution that is issued pursuant to AIPA, and that certainly doesn't settle the matter. I would note that Congress did in 1996, as Ms. Ainsley noted, pass the Iran Sanctions Act, which codified some of those provisions. It really related to weapons of mass destruction. 2010, Congress did again. In the Doms and Moor case, in which they approved the delegation in the civil context, the Court expressly noted that congressional acquiescence in the form of inaction or related legislation was a strong indicator of congressional acceptance. And I believe the same could be said here. That the two circuit courts that have considered the delegation of criminal authority under AIPA have both found that the delegation was constitutional. And they analyzed the Toobie, they went through the Toobie analysis and compared the constraints here to those present in Toobie, which involved the President's ability to identify controlled substances that would be subject to criminal penalties. And found that the constraints in the act were comparable to those in Toobie. They also stressed the power, the broad deference that is to be a court of the President in foreign affairs. And that's a very important factor. I know it was treated dismissively by the defense, but that is a guiding factor in this case. It was in Doms and Moor, which quoted at length the prior decision in Curtis Wright, where the court explained at length the difference in treatment between delegations in the foreign arena and those in the domestic arena. And how even a delegation that would not withstand scrutiny in the domestic arena may very well do so in the foreign arena because the aim is to protect the United States from hurtful conduct by a hostile nation. That may help you in terms of the concept, or in the abstract, it may if it has any effect on the facts of any given case, it may not the facts in this case seem to be less egregious than some of the other cases that seem to more directly implicate foreign policy. Well, my response to that would be, Your Honor, that in examining the delegation of authority under IEPA to set criminal penalties, the particular resolutions at issue or even the particular facts of the case are not, they are really not pertinent to the analysis. The analysis is whether the statute itself contains those principles. In sum, on that issue, the government's position is that the delegation of authority under IEPA to set criminal penalties is guided by intelligible principles and should be found constitutional by this court. To get to the points on the informational materials exemption, this was a question of fact that was submitted to the jury. The jury found that Mr. Amirnaz's misconduct was not, did not fall within the informational materials exemption and there is no basis to disturb that conclusion. ChemPlan, first of all, I would disagree that it affects more than counts two and five which involved ChemPlan directly. I don't believe it has any impact on count four. ChemPlan was software. It contained a database but it was interactive dynamic software that allowed the user, it gave them a variety of information, allowed them to manipulate, add to that information and come up with calculations of their own individualized production assessments. Each package that was sold was specifically tailored to the end user depending on what industry they were in. You're referring to that evidence to show this comes within the regulatory exemption. That's correct. The government's position is that this is not informational material. Flat out, it did not come within the informational materials exemption. As a fallback, the jury was asked to consider whether if it was considered informational material, it came within the carve-out. And we believe the evidence didn't satisfy, either that did not show that it fell within the informational materials exemption or that it did show that if it did, it certainly came within the carve-out. I mean, the defense concedes in their reply brief that it was not, that it would never be fully created since it's designed to be responsive to new inputs. So at a minimum, it was not fully created in existence. That term, the terms in the carve-out to me are very clear. If material can be altered or has been altered, it doesn't come within the informational materials exemption. It's as simple as that. So the evidence here was more than sufficient to establish that ChemPlan did not come within the informational materials exception. The exception itself is not unconstitutionally vague. Its meaning is clear. This appears to be a facial challenge since the contention is that it's so amorphous as to be incomprehensible. And a facial challenge can only be upheld if it's impermissibly vague in all applications. And the defense has not met this burden. And the simple solution to all of this to the extent there was any confusion, particularly when it involves an economic regulation, is for the individual to investigate the pertinent legislation, but also to make administrative inquiry. He did only after he had been stopped by customs agents and materials had been seized, and at that point he made a self-serving call to OFAC for the first time. So he did not take those steps prior to that time as he should have. Unless your honors have any other questions for me? Thank you. Thank you, Your Honor. Your Honor, there are a number of different points that I want to make. First, clearly, I hope I made it clear in my original argument. I am not asking the Court to invalidate the Iran embargo. It is a very narrow challenge. It is to the criminal aspect and particularly to those aspects that have not been regulated properly by Congress as they have been in the public law that we have seen developing over the last few years. Secondly, so far as the intelligible principles are concerned, the government points to a number of intelligible principles or what they say are intelligible principles and so did the Court in Arch Trading and in Dafir. But in fact, all of these intelligible principles relate only to the circumstances under which the President can announce that there is a particular threat, an unusual and extraordinary threat and so on. Congress has the right to challenge that finding. There are various things that cabin the President's declaration that a particular country presents an extraordinary threat to national security and so on. I'm not challenging that. What I'm challenging is once the President has determined that Iran for instance presents an extraordinary threat, what can he do? What conduct can he criminalize? And there is nothing in this statute that he can do after he finds the extraordinary threat. The reason I didn't well, if you compare that to Mestreda or to any of the other statutes where under as I recall the Attorney General in order to schedule ecstasy or whatever the drug was as a temporarily banned substance had to 30 days in the Federal Register, had to consult with the Secretary of HEW or HHS, had to, there were a number of things and then he had to consider whether the drug in question was capable of surreptitious manufacture, there were a number of things that the Secretary had to do and had to consider. And that was after the Secretary had decided that this new threat to public safety. All of the intelligible principles that Ms. McKeon spoke of and that Dafir spoke of and that Arch Trading spoke of, all of those relate to the circumstances of the President's declaration that Iran for instance represents a threat. None of them have the kind of intelligible principles set forth in Mestreda or Tubi where once the threat has been identified what can you do? The President's authority in this area is vast. Once he's decided that there's an extraordinary threat, he can do anything. Do we have two standards here? One for foreign, one for those delegations involving foreign affairs and another in all other contexts other than foreign affairs? Your Honor, as I said this is, that is, I suggest that needs to be looked at again because I didn't see anything in Youngstown Sheet and Tube or Curtis Wright that said that if you could, if the word foreign had anything to do with it it was the President's to do with as he chose. The Constitution itself says that commerce with foreign nations, which is clearly what this case is about at heart, is the responsibility of Congress. So for me it seems to me that you need more than intelligible principles once the President has declared that this threat exists. Good. Let me ask my colleagues if they have any other questions. Oh, can I please? We'll give you one minute. Thank you. With respect to the software and the fact that Ms. McCann, first off that you can't say what the jury found. You cannot say whether the jury found that it wasn't informational material. I don't think they did find that. I think it clearly is informational material. They may have found that it was subject to fully in existence. But software itself under 560.418 of the Code of Federal Regulations is by OFAC's own determination capable of being informational material. That being so, I think it makes nonsense of Ms. McCann's argument with all due respect. But here the software was used to assist in the manufacture of chemicals. No, Your Honor. Well, it was the information was given, as I say, to Dow Chemical, to DuPont and the National Petrochemical Company to decide, not to make chemicals, but to decide where in the world the chemicals were available, at what cost could they be shipped to the purchaser, that kind of thing. Yes, it was information about chemicals. And there was proprietary information. There is nothing in the statute that says anything the First Amendment does not only protect public information. It protects proprietary information, trademark information, personal opinion, artistic expression. It is a very the government's having, you know, injecting this public data into it at the last minute. And my last point, the government came up with this theory, on which Dr. Amirnazmi was convicted. At the very eleventh hour, until two days before it went to the jury, we had no idea that this information not fully in existence was at issue in the case. The trial memorandum of the government said that if we raise the informational exemption, then their response was going to be something along the lines of hazardous materials. So my feeling about this case is that the government managed to find a conviction, managed to persuade the jury on the basis of a carve-out that Congress did not authorize and that was not in the case until the government, as a last-ditch effort, found it. Thank you. Ms. Ainslie, thank you very much. The case was extremely well argued. The briefs were excellent. Take the matter under advisement.